**In re MANAGED CARE LITIGATION.**

**This Document Relates to Provider Track Cases.**

**MDL No. 1334.**
**No. 00–1334–MD–MORENO.**

United States District Court, S.D. Florida, Miami Division.

March 2, 2001.

---

---

**ORDER GRANTING IN PART WITH-OUT PREJUDICE MOTIONS TO DISMISS PROVIDER TRACK COMPLAINT**

MORENO, District Judge.

Plaintiffs are doctors suing managed care insurance companies ("HMOs") for alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Employee Retirement Income Security Act ("ERISA"), plus federal and state prompt pay statutes. The Plaintiffs also have filed breach of contract, unjust enrichment and *quantum meruit* claims. The Court dismisses, without prejudice, the RICO claims because the Plaintiffs have not properly pled the "enterprise" element. The Court also dismisses, without prejudice, the state prompt-payment statutory claims as insufficiently pled. In addition, the Court dismisses, with prejudice, the Plaintiffs' federal claim for prompt payment for services rendered because there is no such implied cause of action arising under the Medicare Act or its regulations. However, the Court finds that ERISA does not preempt the Plaintiffs' claims for breach of contract, *quantum meruit* and unjust enrichment, and therefore denies the Defendants' motions to dismiss these claims.

## BACKGROUND

The Plaintiffs are seven health care providers from various states who have business relationships with the eight managed care insurance company Defendants. The original Complaint was filed in the Western District of Kentucky as *Charles B. Shane, M.D., et. al. v. Humana, Inc., et. al.,* W.D. Ky, C.A. No. 3:00–53, and listed only Humana and its subsidiaries as Defendants. The case was transferred to this Court by the Judicial Panel on Multidistrict Litigation on July 21, 2000. *See* 28 U.S.C. § 1407 (permitting the transfer of federal district court civil actions involving common questions of fact to a single district court for consolidated pretrial proceedings). The Amended Complaint thereafter added the other Defendants.

The following facts, although contested in part by the Defendants, are assumed to be true for the purpose of a Federal Rules of Civil Procedure 12(b)(6) motion to dismiss. The Plaintiffs allege that the Defendants have undertaken a common course of conduct designed to further a scheme of fraud and extortion to the detriment of the Plaintiffs. This scheme begins with the Defendants' "internal policies and procedures specifically designed to systematically obstruct, reduce, delay and deny payment and reimbursements to health care providers" in contravention of contractual agreements. Amended Complaint, ¶ 153. These policies are implemented by third party claim reviewers who receive monetary incentives to deny claims often arbitrarily and without regard to "medical necessity" as defined in provider contracts. *Id.* at ¶¶ 154, 158.

The Plaintiffs charge that the Defendants and their agents engage in "undisclosed automatic 'downcoding' of claims submitted by physicians." *Id.* at ¶ 164. "Downcoding" is an operation whereby "CPT codes" (a benefit code entered on a reimbursement form by the provider which refers to a particular service) are arbitrarily and without notice changed in a manner designed to reduce payments due to the physicians. *Id.* at ¶ 164. "Bundling" is another process in which the Defendants arbitrarily reduce payments by combining two or more procedures. *Id.* at ¶ 165.

The Plaintiffs furthermore submit that the Defendants improperly conceal their manipulation of these procedures and fraudulently misrepresent the criteria for coverage determination, treatment decisions, payments and reimbursements. *Id.* at ¶ 159. The insurance companies' rate-setting methodology lacks an actuarial basis, and the Defendants refuse to provide data pertaining to this methodology. *Id.* at ¶ 181. The Defendants also systematically "target, coerce, threaten and intimidate providers who objected to Defendants['] wrongful practices." *Id.* at ¶¶ 155–56. The Plaintiffs allege that the managed care Defendants monopolize the patient referral market. *Id.* at ¶¶ 174–176, 178, 180. Through this monopolistic power, the Defendants use economic pressure to continue the fraudulent scheme and extort concessions and property rights from the Plaintiffs.

Counts I, II and III of the Plaintiffs' Amended Complaint seek relief for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(a) and (c) and conspiracy to violate these two subsections. The Plaintiffs allege that the Defendants violated federal criminal statutes prohibiting fraud, extortion and bribery as part of a pattern of racketeering activity. Count IV alleges that the Defendants aided and abetted violations of subsections (a) and (c). Count V is a claim for benefits under the federal Employee Retirement Income Security Act. In the alternative, the Plaintiffs conceive of counts VI, VII, and IX, which are pendant state law claims for breach of contract, *quantum meruit* and unjust enrichment. Finally, counts VIII and X ask for relief pursuant to thirteen state statutes and a federal regulatory provision which require that health insurance companies pay certain claims for reimbursement within a specified time period.

## STANDARD OF REVIEW

A court will not grant a motion to dismiss unless the plaintiff fails to allege any facts that would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *St. Joseph's Hospital, Inc. v. Hospital Corp. of America,* 795 F.2d 948 (11th Cir.1986).

## DISCUSSION

At the outset the Defendants contend that, in light of the Supreme Court decision *Pegram v. Herdrich,* 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000), the Plaintiffs' claims should not proceed because they amount to a "wholesale attack[ ] on existing HMOs," in contravention of "the congressional policy of allowing HMO organizations." *Id.,* 120 S.Ct. at 2157. In *Pegram,* a plaintiff patient brought medical malpractice, state-law fraud and ERISA claims against her doctor and the health maintenance organization, on the theory that the HMO breached its fiduciary duty to the patient by

providing incentives for its physicians to limit medical care and procedures. *Id.*, 120 S.Ct. at 2147–48. After parsing congressional intent and policy arguments, the Court held that "mixed eligibility decisions by HMO physicians are not fiduciary decisions under ERISA," *id.*, 120 S.Ct. at 2158, and therefore the plaintiff failed to state a claim for breach of fiduciary duty under ERISA.

Defendants read *Pegram* as if it were a talisman before which all of Plaintiffs' claims should fail. Yet the Court in *Pegram* did not fashion an all-encompassing cloak of immunity for the health care industry. Instead, partly out of a concern that granting the remedy sought by the Plaintiff in *Pegram* would result in "nothing less than elimination of the for-profit HMO," *id.*, 120 S.Ct. at 2156, the Court reached its narrow holding. The viability of HMO-type structures will not be imperiled if such entities are held accountable for concrete harm flowing from acts of fraud, extortion and breach of contract, as alleged by the Plaintiffs. *Cf. id.*, 120 S.Ct. at 2157 ("[T]he Federal Judiciary would be acting contrary to the congressional policy of allowing HMO organizations if it were to entertain an ERISA fiduciary claim portending wholesale attacks on existing HMOs solely because of their structure, untethered to claims of concrete harm.").

Furthermore, *Pegram* concerned an ERISA claim brought by a patient with a significantly different factual situation. The Plaintiffs here seek relief under a number of state and federal statutes in compliance with the *Pegram* Court's observation that remedies to be applied against HMOs should be constructed by the legislature rather than the judiciary. Consequently, *Pegram* does not act as a bar to these claims.[1]

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

RICO, 18 U.S.C. § 1962, proscribes in relevant part: (1) investing income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in any enterprise which affects interstate commerce (subsection a), (2) conducting or participating in the affairs of any enterprise which affects interstate commerce through a pattern of racketeering activity or collection of unlawful debt (subsection c), and (3) conspiring to violate any of the provisions of subsections (a), (b), or (c) (subsection d).

As defined by RICO, "racketeering activity" includes a lengthy list of enumerated federal and state crimes, including those crimes alleged in this case, namely extortion (as set forth in the Hobbs Act), mail fraud, wire fraud and bribery/gratuity. A " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of [RICO] and the last of which occurred within ten years (excluding any term of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). RICO establishes both criminal penalties, *see* 18

---

1. Plaintiff Breen did not specify in the Amended Complaint the source of Defendant Foundation Health System Inc.'s contractual obligations, causing Defendant Foundation to argue additionally that Plaintiff Breen could not assert standing through contracts between Foundation subsidiaries and physician groups. Foundation subsequently located contractual agreements directly linking the Defendant to Plaintiff Breen. *See* Defendant Foundation Health Systems, Inc.'s Notice of Correction of its Motion to Dismiss at 2. In view of this Court's Order of December 11, 2000 stating that Plaintiff Breen's claims be arbitrated pursuant to these contracts, all of the Defendant's standing arguments are denied as moot.

U.S.C. § 1963, and civil remedies, *see* 18 U.S.C. § 1964, for violations of Section 1962. Section 1964 provides a private cause of action in federal district court for "any person injured in his business or property by reason of a violation of section 1962." § 1964(c). The injured party may recover treble damages, as well as costs. *Id.*

### STANDING

■ The Defendants first submit that the Plaintiffs lack the requisite standing to bring RICO claims. A "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation" of RICO. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The Defendants rely primarily on *Maio v. Aetna, Inc.,* 221 F.3d 472 (3d Cir.2000). The plaintiffs in *Maio* were subscribers (patients) who predicated their theory of injury upon the proposition that "the policies and practices described in the complaint ... make it a near certainty that they will receive diminished or compromised [contractual benefits] eventually." 221 F.3d at 494.

Even if this Court were to adopt the Third Circuit's reasoning, the Defendants' argument would fail as to these plaintiff providers (doctors). The Plaintiffs in this case are providers who aver that they are the victims of past, present and continuing fraud, extortion and conspiracy perpetrated by the Defendants. In addition to the assertions in their Amended Complaint, the Plaintiffs provide an extensive, specific list of fraudulent reimbursement denials or reductions, improper requests for refunds, administrative costs associated with handling these continual payment disputes and monetary losses flowing from extortionate acts. *See* Supplement to Civil Rico Case Statement, ¶¶ 1 (reimbursement denial), 28 (administrative costs associated with appealing payment delayed six months), 35 (Defendant paid only six percent of a $16,495 claim following an appeal process), 125 (Defendants through extortionate means wrongfully retained money owed to providers). The Court is satisfied that the Plaintiffs meet the standing requirement of 18 U.S.C.A. § 1964(c), which accords relief to "[a]ny person injured in his business or property by reason of a violation of section 1962."

### THE MCCARRAN–FERGUSON ACT

■ Defendants Aetna, Foundation, Prudential and Wellpoint contend that the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), bars the Plaintiffs' RICO claims. The Act states that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b).

The Defendants point to statutes from California, Florida and Texas which specifically authorize cost-containment processes by insurance companies, regulate these practices and provide grievance procedures for claims review. *See, e.g.,* Fla. Stat. § 627.4234 (Health care plans "must contain one or more ... procedure or provisions to contain health insurance costs or cost increases"); Fla. Stat. § 641.3156 (prohibiting arbitrary denial of claims), Tex. Ins.Code Ann. art. 21.58A(4) (forbidding "unnecessary or unreasonable repetitive" review of claims). According to the Defendants, the Plaintiffs' RICO claims would frustrate state law policy which celebrates cost-containment processes. Furthermore, the Defendants fear that this federal civil action would interfere with carefully crafted regulations implemented

by the states in violation of the McCarran–Ferguson Act and the interpretation of that statute by the Supreme Court in *Humana, Inc. v. Forsyth,* 525 U.S. 299, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999).

The Supreme Court in *Humana* held that the McCarran–Ferguson Act does not bar private civil RICO suits. 525 U.S. at 314, 119 S.Ct. 710. The Court observed that RICO and the state insurance laws could be applied in harmony, and that RICO did not frustrate any state policy regarding the insurance laws. To the contrary, the Court said permitting private civil RICO suits would aid and enhance the state regulation of the insurance industry. *Id.* The Defendants have not convincingly shown that application of the federal RICO statute will significantly impair rather than advance the interests of state insurance laws or that this action will disrupt a state administrative system. If the Plaintiffs prevail on the merits of their claims, the Court will revisit this issue in the context of assessing appropriate relief.

### ABSTENTION

■ Defendant Wellpoint argues that this Court should abstain under the *Burford* doctrine. *See Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). That doctrine allows a federal court to abstain as a matter of comity if federal adjudication would be disruptive of state efforts to establish a coherent policy with respect to the matter at issue. The purpose of *Burford* abstention is to "protect[ ] complex state administrative processes from undue federal interference." *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 362, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989). The primary justifications for the rule are "the expertise of the agency deferred to and the need for a uniform interpretation of a statute or regulation." *Boyes v. Shell*

*Oil Products Co.,* 199 F.3d 1260, 1265 (11th Cir.2000), quoting *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1310 (2d Cir.1990).

The Defendant argues that this RICO action's potential effect on California's "indisputably complex and delicately balanced Knox–Keene regulations" counsels in favor of abstention. *See* Wellpoint's Motion to Dismiss the Provider Track Amended Complaint at 9. But *Burford* abstention, also known as the "primary jurisdiction doctrine," is of dubious applicability where the claim is brought under federal law and the remedy would be left to a state agency. *Boyes,* 199 F.3d at 1265 n. 11, citing *County of Suffolk,* 907 F.2d at 1310. *Burford* allows a federal court to abstain only under extraordinary circumstances in which the state's interests are clearly paramount.

While the Court must balance the interests of federalism and comity, this "balance only rarely favors abstention." *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 728, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). Mere claims that significant issues of state policy are at stake does not justify abstention. In addition, the Defendant has not shown that this RICO action will adversely impact California's managed care regulations. Consequently, *Burford* abstention is not appropriate in this case.

### STATUTE OF LIMITATIONS

Next, Defendant United argues that the Plaintiffs' ten-year class period runs afoul of the statute of limitations. The Plaintiffs seek to certify a class dating back to January 1990. Amended Complaint, ¶ 189. Civil RICO actions must be filed within four years. *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987).

The Plaintiffs claim that the ten-year class is appropriate because, under the "injury discovery accrual rule," the statute

of limitations for RICO actions does not begin to accrue until the Plaintiff knew or reasonably should have known of the injury. *Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). Furthermore, the Plaintiffs claim that there was fraudulent concealment which would toll the statute of limitations period. When the Plaintiffs should have reasonably known about the allegations in the Complaint is a factual question that cannot be addressed at this stage in the proceedings.

### ENTERPRISE

■ The Plaintiffs charge that the Defendants have violated 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The Defendants' actions are alleged to be indictable under the following provisions of Title 18 of the United States Code: § 1341 (mail fraud), § 1343 (wire fraud), § 1346 (scheme or artifice to defraud), § 1951 (Hobbs Act), § 1952 (Travel Act) and § 1954 (offer, acceptance, or solicitation to influence operations of employee benefit plan).

The Defendants argue that the Plaintiffs' Amended Complaint does not sufficiently demonstrate the existence of an enterprise. The term "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1861(4). This group of persons must be associated together for a "common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576,

583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). This "association of individual entities, however loose or informal, ... furnishes a vehicle for the commission of two or more predicate crimes" which comprise the racketeering activity. *United States v. Goldin,* 219 F.3d 1271, 1275 (11th Cir. 2000). The existence of an enterprise may be proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524. Although RICO liability is not limited to those with primary responsibility for the enterprise's affairs, the Supreme Court has held that the "operation or management test" requires that "one must have some part in directing those affairs." *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

The Plaintiffs allege three alternative theories of an enterprise. The first theory is that the "health care delivery system in the United States" is an enterprise. Amended Complaint, ¶ 204. According to this Health Care Delivery System Enterprise theory, "health care providers must be associated and must function as at least an informal organization to provide health care services to residents of the United States." *Id.* The next theory is simply that the "health care systems within each geographic region constitute enterprises." *Id.* at ¶ 205.

The third enterprise theory is referred to by Plaintiffs as the "Managed Care Enterprise." This enterprise is made up of "the third-party entities which promulgate health care reimbursement guidelines and/or which are subcontracted by the Defendants for the purpose of reviewing claims made of the Defendants by Plaintiffs." *Id.* at ¶ 206 The Plaintiffs do not specifically identify any of these third-par-

ty entities in this section of their Complaint.

The Plaintiffs' first two theories are the most troubling. The Plaintiffs did not suggest that any court has ever held that an entire nationwide or regional industry or profession may constitute an enterprise. These two enterprises lack a distinct structure; one cannot easily identify who comes within the ambit of these enterprises, or where they begin and end. Plaintiffs' Health Care Delivery System Enterprise and Regional Health Care Delivery System Enterprise theories are located on the periphery of an already extremely broad definition of enterprise.

■ The Managed Care Enterprise more closely resembles a RICO enterprise. However, as currently pled, the Court reads this theory to be that a group of commercial third-party entities *apparently unrelated to each other* who contract on a regular basis with some or all of the Defendants are the enterprise. The Plaintiffs have not pled a sufficient association between these third-party entities for the purposes of a RICO enterprise. In addition, even though the Plaintiffs are apparently in possession of information which would permit them to specifically identify some of these third-party entities, the Plaintiffs did not identify these entities when pleading their enterprise. *See id.* at ¶ 122 (alleging that Humana contracted with Value Health Sciences for "medical review systems" which review requests for authorizations). Finally, although Plaintiffs' Memorandum of Law in Opposition to the Humana Defendants' Motion to Dismiss states that the Defendants are part of the Managed Care Enterprise, this submission is contradicted by the Plaintiffs' pleadings. *See, e.g.,* Civil RICO Case Statement Pursuant to Local Rule 12.1, answers 6(f) and (g) (Defendants are separate from and not members of any of these

three enterprises); Amended Complaint, ¶ 206.

The Court finds that at this time the Plaintiffs have not sufficiently pled the existence of an enterprise. Therefore the § 1962(c) claim is dismissed without prejudice with leave to file an amended complaint curing these deficiencies no later than March 26, 2001.

## PREDICATE ACTS

### A. Mail and Wire Fraud

■ Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme. *United States v. Downs,* 870 F.2d 613, 615 (11th Cir. 1989). A "scheme to defraud" entails the making of misrepresentations intended and reasonably calculated to deceive persons of ordinary prudence and comprehension. *Pelletier v. Zweifel,* 921 F.2d 1465, 1498–99 (11th Cir.1991). Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." That is, the Plaintiffs must allege "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1380–81 (11th Cir.1997).

■ The Plaintiffs state that "contrary to their agreements and representations to class members, the Defendants have each adopted internal policies and procedures specifically designed to systematically obstruct, reduce, delay and deny payments and reimbursements to health care provid-

ers." Amended Complaint, ¶ 153. The Defendants are alleged to engage in a systematic, fraudulent scheme of automatic downcoding, CPT code manipulation, improper bundling and use of inappropriate criteria to deny or reduce claims for reimbursement without a reasonable appeal mechanism. *Id.* at ¶¶ 156–168. Plaintiffs' Supplement to Civil RICO Statement expounds upon the underlying allegations of fraud in a manner sufficiently particular, as it supplies details including specific dates, persons, methods and the resulting harm. The Plaintiffs did omit Defendant Pacificare from the section of their RICO statement detailing the mail fraud violations and did not state with particularity the wire fraud allegations against Aetna, Prudential, United and Wellpoint. However, the elements of mail and wire fraud are essentially the same. *Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). Therefore, a factual account of the events underlying the alleged mail fraud may also serve to preserve the Plaintiffs' wire fraud claims (and vice versa).

The Defendants submit that, contrary to the Plaintiffs' claims, the Defendants do in fact disclose material information pertaining to their utilization review process, reimbursement methods and other cost-containment procedures. But for the purposes of a motion to dismiss, Plaintiffs' factual allegations are taken as true. *Brooks,* 116 F.3d at 1369. In addition, the Defendants argue that their plans are subject to review by state regulatory authorities (the "presumed knowledge" doctrine) and that the cost-containment procedures are authorized by state and federal law. Since the Defendants' arguments would require a factual inquiry to determine which practices have been reviewed, certified or statutorily authorized by which governmental authorities, it would be premature to examine them at this stage of the case. The Plaintiffs have properly pled against each Defendant predicate acts of mail and wire fraud constituting a continuing pattern of racketeering activity.

**B. Extortion**

■ Under the Hobbs Act, 18 U.S.C. § 1951, "whoever ... affects commerce ... by ... extortion shall be fined not more than $10,000 or imprisoned not more than twenty years, or both." Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

Plaintiffs allege that the "Defendants have engaged in extortionate conduct designed to exploit the Plaintiffs and the class' fear of economic loss or loss of business through the use of their restrictive 'all products' requirements.... extorting plaintiffs and the class through fear of economic loss." Amended Complaint, ¶ 176. Furthermore, the Plaintiffs claim that the Defendants possess "overwhelming and dominant economic and market power" and used threats of termination or non-renewal to "coerce Plaintiffs and the class into accepting contracts and Defendants' policies and practices on a 'take it or leave it' basis." *Id.* at ¶ 174. As a result of this activity, the Defendants are said to have obtained from the Plaintiffs' property interests to which they are not entitled. *Id.* at ¶¶ 233, 277.

The Defendants strongly argue that if the Plaintiffs were injured, their bruises are a result of nothing more than perfectly legal hard bargaining carried out at arm's length between participants in the health care market. Instead, a successful extortion theory requires that "the fear of economic loss is separate and distinct from

performance on the contract" and the claim cannot be maintained when the "only fear of economic loss is that which accompanies any party to a contract when he suspects that compliance and compensation may not be forthcoming." *Robert Suris Gen. Contractor Corp. v. New Metropolitan Fed. Sav. & Loan Ass'n,* 873 F.2d 1401, 1405 (11th Cir.1989). *See also Lee v. Flightsafety Services Corp.,* 20 F.3d 428, 433 (11th Cir.1994) (take-it-or leave-it bargaining alone is not wrongful enough to establish the requisite coercion).

The Defendants also rely heavily on *Brokerage Concepts v. U.S. Healthcare,* 140 F.3d 494 (3d Cir.1998), in which the Third Circuit joined two other circuits in expanding the "claim of right" defense to extortion, as established in *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). The Court in *Enmons* found that since the Hobbs Act requires that a defendant's conduct be "wrongful," this requirement cannot be maintained where the alleged extortionist had a lawful claim to the property. *Id.* at 400, 93 S.Ct. 1007. The *Brokerage Concepts* court expanded this defense to those situations "involving solely the accusation of the wrongful use of economic fear where two private parties have engaged in a mutually beneficial exchange of property." 140 F.3d at 526.

The Plaintiffs allege that the Defendants possess power akin to a monopoly, something more than mere hard bargaining on a level playing field. *Cf. Brokerage Concepts,* 140 F.3d at 526 n. 23 (suggesting that violation of antitrust laws may confer upon an aggrieved party a right to be free from economic coercion which would negate the claim of right defense). Moreover, the Plaintiffs claim that they feared not only the economic loss which accompanied the contracts at issue, but that the Defendants threatened to exclude them from the network, which, it is argued, would eviscerate the Plaintiffs' practice and livelihood.

The distinction between extortion and mere hard bargaining or breach of contract is not always clear. In addition, "the line separating lawful from unlawful claims to property obtained in business negotiations is by no means self evident." *Id.* at 524. By submitting that the Defendants have in effect held an economic gun to the Plaintiffs' heads and used other coercive methods to obtain property from the providers, these Plaintiffs have sufficiently pled claims of extortion under the relaxed standard set forth in the federal pleading rules. Hence, the Plaintiffs will have the opportunity to prove their economic coercion theory.

It remains to be seen in what manner property was obtained, and whether the market atmosphere and the Defendants' actions were sufficiently coercive. The Plaintiffs should be prepared to demonstrate exactly what property the Defendants actually obtained from the Plaintiffs and how or whether it is possible to extort intangible property rights, services or fiduciary obligations from health care professionals. *See, e.g.,* Amended Complaint, ¶ 277.

Defendant CIGNA argues that the Hobbs Act requires a showing that its conduct was "willful." Memorandum of Law in Support of CIGNA Defendant's Motion to Dismiss at 23. CIGNA suggests that its actions are authorized by federal and state law, and therefore Plaintiffs cannot show that CIGNA "acted with knowledge that [its] conduct was unlawful." *See Ratzlaf v. United States,* 510 U.S. 135, 137, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). CIGNA's state of mind and whether it does in fact comply with federal and state law is a factual issue reserved for the

summary judgment stage of these proceedings.

## C. Travel Act

■ 18 U.S.C.A. § 1952, more commonly known as the Travel Act, establishes criminal liability for one who travels in interstate commerce or uses the mail system, with intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." *Id.* The Plaintiffs have properly pled predicate acts of extortion. Therefore, the Plaintiffs' claim that "the Defendants on numerous occasions did travel and caused others . . . to travel in interstate commerce in order to attempt to and to commit . . . extortion," coupled with the additional factual allegations offered by the Plaintiffs, is sufficient to survive the Defendants' motions to dismiss. Amended Complaint, ¶¶ 237, 184

## D. 18 U.S.C. § 1954

The Plaintiffs' final predicate act allegation concerns 18 U.S.C. § 1954, which holds that "an administrator, officer, trustee, custodian, counsel, agent, or employee of any employee welfare benefit plan or employee pension benefit plan" who gives, offers, "receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of the actions, decisions, or other duties relating to any question or matter concerning such plan . . . shall be fined under this title or imprisoned not more than three years."

In the course of arguing for dismissal of these counts, the Defendants appear to presume that the Plaintiffs' vague allegations include only charges of bribery in connection with these employee welfare benefit plans. In fact, Section 1954 prohibits both bribes and gratuities. The "with intent to be influenced" statutory language refers to bribery, and bribery requires a quid pro quo. *See U.S. v. Kummer,* 89 F.3d 1536, 1540 (11th Cir.1996). Alternatively, the words "because of" refer to gratuities, which are improper payments made "because of the act," and do not require a *quid pro quo. Id.* It is not clear whether the Plaintiffs are relying on a bribery or gratuity theory.

Although the Defendants protest that this section explicitly does not extend to "the payment to or acceptance by any person of *bona fide* salary, compensation, or other payments made for goods or facilities actually furnished or for services actually performed in the regular course of his duties," this observation is presently of no consequence. The words "bona fide" limit the liability limitation, and the thrust of Plaintiffs' entire complaint is that Defendants received property through actions inconsistent with good faith business practices.

Nevertheless, the Court concludes that the Plaintiffs have not successfully pled predicate acts under Section 1954. If the Plaintiffs are alleging bribery, they did not give "any indication of the manner, if any, in which [the Defendants] actually exercised their influence over the plan." *In re Fairchild Industries, Inc. and GMF Investments, Inc.,* 768 F.Supp. 1528, 1536 (N.D.Fla.1990). Moreover, the Plaintiffs' boilerplate statement "[P]laintiffs and the class therefore have been injured in its business or property as a result of Defendants' overt acts and racketeering activities" does not aid the Court in determining whether the Plaintiffs have standing to allege the Section 1954 predicate act violations. The Defendants' motions to dismiss are granted with respect to the Section 1954 portion of Plaintiffs' complaint. The

Plaintiffs are given leave to amend their complaint no later than March 26, 2001.

### INVESTMENT OR USE OF ENTERPRISE PROCEEDS

Section 1962(a) states: "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." The Plaintiffs have not properly pled an enterprise. Therefore, the Court grants the Defendants' motions to dismiss this claim, but gives the Plaintiffs leave to amend their complaint no later than March 26, 2001, reserving judgment on the Defendants' arguments that the Plaintiffs do not have standing to pursue this claim.

### CONSPIRACY

The Plaintiffs also allege that the Defendants have conspired to violate Sections 1962(a) and (c). *See* § 1962(d). The Plaintiffs must allege "that the conspirators agreed to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity." *United States v. Castro,* 89 F.3d 1443, 1451 (11th Cir.1996). Proof of an agreement to participate in a RICO conspiracy can be established by either: (1) "showing an agreement of an overall objective or (2) in the absence of an agreement on an overall objective, by showing that a defendant agreed personally to commit two predicate acts." *United States v. Church,* 955 F.2d 688, 694 (11th Cir.1992), cert. denied, 506 U.S. 881, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992). The requisite agreement may be inferred from the conduct of the participants. *Id.* at 695. Unlike criminal RICO conspiracy, proof of an "overt act" is required for a civil RICO conspiracy claim. *Beck v. Prupis,* 162 F.3d 1090, 1099 n. 18 (11th Cir.1998), *aff'd,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

Since the Plaintiffs here failed to properly plead an enterprise, the Court dismisses the conspiracy claims. *See United States v. Boldin,* 772 F.2d 719, 727 (11th Cir.1985) ("A RICO conspiracy charge requires proof of ... the existence of an 'enterprise.'"). Absent this defect, however, the Court finds that the Plaintiffs have adequately pled a conspiracy claim under Section 1962(d). The Plaintiffs posit that the Defendants collectively exercised "their overwhelming and dominant economic and market power to coerce Plaintiffs and the class" in an extortionate manner. Amended Complaint, ¶¶ 174, 176. Indeed, the Plaintiffs may very well be required to prove a conspiracy in order to succeed on an extortion claim premised upon monopolistic power. In addition, the Plaintiffs allege that the Defendants agreed among themselves to further a scheme to defraud, and that as a consequence the Plaintiffs were injured. *Id.* at ¶¶ 234, 276–280. Therefore the Plaintiffs' conspiracy claims are dismissed, but subject to reinstatement if the Plaintiffs successfully re-plead the enterprise element.

### AIDER AND ABETTOR LIABILITY

In Count IV of their complaint, the Plaintiffs allege that the Defendants are guilty of aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c). Title 18 U.S.C. § 2 provides that "[w]hoever commits an offense against the United

States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." The primary issue is whether there is an implied cause of action for aiding and abetting a RICO violation. The Eleventh Circuit settled this issue in *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir.1994) by concluding that such liability does exist.

However, two weeks later in *Central Bank v. First Interstate Bank*, 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that one may not advance a civil cause of action for aiding and abetting a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The Court found that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Central Bank*, 511 U.S. at 182, 114 S.Ct. 1439. The general federal criminal aider and abettor statute, 18 U.S.C. § 2, which Plaintiffs rely upon in this case, is not "a general civil aiding and abetting statute ... for suits by private parties." *Id.*

The Defendants advance the argument that *Central Bank* implicitly overrules *Cox* insofar as that decision authorizes aiding and abetting claims. The *Cox* Court did not engage in extended analysis, preferring instead to cite to *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1356 (3d Cir.1987). The Third Circuit has since reversed its position on the issue in light of *Central Bank. See Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 656 (3d Cir.1998); *Pennsylvania Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 843 (3d Cir.2000). On the other hand, the Supreme Court denied certiorari

in *Cox* nearly one year after *Central Bank of Denver. USX Corp. v. Cox*, 513 U.S. 1110, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995).

It is the duty of this Court to follow controlling Eleventh Circuit precedent unless there is a direct Supreme Court case on the particular issue in question holding to the contrary. Therefore the Plaintiffs can maintain a cause of action for aiding and abetting. For the moment, however, these claims are dismissed because the Plaintiffs have failed to properly plead an enterprise. *See Petro–Tech, Inc.*, 824 F.2d at 1357 (aiding and abetting liability claim viable "[s]o long as all of RICO's other requirements are met").

### BREACH OF CONTRACT

The Plaintiffs contend that Defendant Humana has breached its contracts with providers by declining to submit proper reimbursement for medical services rendered. Amended Complaint, ¶ 301. Plaintiffs admit that they did not state a claim against any Defendants other than Humana and maintain that this omission was "the result of a scrivener's error." Since the Plaintiffs are being given leave to amend their complaint, they may at that time list those Defendants against whom they wish to assert contract claims no later than March 26, 2001.

Anticipating that the Plaintiffs will amend their Complaint, the Defendants respond that the Plaintiffs' contract claims are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1144. ERISA applies to any employee benefit plan, provided that it is established or maintained by an employer or employee organization engaged in commerce or in any industry or activity affecting commerce. 29 U.S.C. § 1003(a). The statute explicitly includes plans provided through the purchase of

insurance. 29 U.S.C. § 1002(1). The preemption section states that this federal statute "shall supercede any and all state laws insofar as they may now or thereafter relate to any employment plan" covered by ERISA. 29 U.S.C. § 1144(a). A state law "relates to" a covered employee benefit plan "if it has a connection with or reference to such a plan." *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992), quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

In *Lordmann Enterprises, Inc. v. Equicor, Inc.*, 32 F.3d 1529 (11th Cir.1994), the Eleventh Circuit agreed with the position of *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236 (5th Cir.1990), that "state law claims brought by health care providers against plan insurers too tenuously affect ERISA plans to be preempted by the Act." *Lordmann Enterprises*, 32 F.3d at 1533. In this case, the Provider Plaintiffs assert that they seek to enforce the terms and conditions of their own contracts with the Defendants, rather than assignments from ERISA beneficiaries. Amended Complaint, ¶ 297. *See also Variety Children's Hospital, Inc. v. Blue Cross/Blue Shield*, 942 F.Supp. 562, 568 (S.D.Fla.1996) (claim not preempted where provider plaintiff brought suit in its independent status as a third-party rather than as an assignee of benefits). The Plaintiffs allege that the Defendants engaged in bundling and downcoding, actions which might sustain a breach of contract claim without a need for reference to the interpretation of ERISA plans. The Plaintiffs' state law contract claims therefore do not "relate to" the ERISA plans, and are not preempted by the Act.

The policy arguments set forth in *Memorial Hospital* and adopted by the Court in *Lordmann Enterprises* elucidate the wisdom of this result. First, preemption of provider contract claims would "defeat rather than promote" ERISA's goal to "protect the interests of employees and beneficiaries covered by benefit plans." *Lordmann Enterprises*, 32 F.3d at 1533. The Court theorized that as a result of preemption, health care providers could no longer rely as freely on the representations of insurers and would therefore act to protect themselves by denying care or raising fees. *Id.* Second, health care providers are not within the scope of ERISA. *Id.* Although employer and employees traded their right to bring a state cause of action in exchange for the benefits of ERISA, the statute does not provide a cause of action for health care providers who treat ERISA participants. In short, preemption of state law claims would leave health care providers with no viable civil remedy. *Id.* at 1533–34.

The Court therefore holds that the Plaintiffs may bring their contract claims free of the shadow of ERISA preemption. Because the Court acknowledges that the Plaintiffs intend to amend and file contract claims against all of the Defendants, it declines to reach Plaintiffs' alternative pleading for monetary and injunctive relief under ERISA. *See id.* at ¶ 296.

 Finally, Humana argues that the provider agreements between Defendant and Plaintiffs Shane and Davis (and by implication Plaintiff Book) obligate the Plaintiffs to exhaust their claims through Humana's grievance procedure. *See* Shane Agreement, ¶ 16; Davis Agreement, ¶ 18. The Plaintiffs respond that to the extent a grievance procedure exists, it is mandatory only for patients, not providers. In view of the Plaintiffs' claims that "Humana systematically targeted, coerced, threatened and intimidated Providers who objected to Humana's wrongful practices," Amended Complaint, ¶ 115, the Plaintiffs

need not pursue remedy under the alleged grievance procedure.

## QUANTUM MERUIT AND UNJUST ENRICHMENT CLAIMS

The Plaintiffs also make claims against the Defendants under the quasi-contract theories of *quantum meruit* and unjust enrichment. All of the parties agree that there are existing contracts between the Plaintiffs and Defendants. A quasi-contract cause of action can only be maintained where the subject matter of the dispute is not covered by a valid and enforceable contract. As an initial matter, the Court agrees with the Defendants that the Plaintiffs cannot maintain these quasi-contract theories based upon the premise that the Plaintiffs are asserting the rights of unnamed providers not before the court who were injured by but do not have contracts with the Defendants. Absent a special relationship or class action, the Plaintiffs at the present time do not have standing to assert the rights of these third parties. *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

To the extent that the Plaintiffs' quasi-contract claims are covered by contractual arrangements between the parties, the Court treats the Plaintiffs' contention as a pleading of alternative or inconsistent claims for relief in accordance with Federal Rule of Civil Procedure 8(e)(2). The Court denies the Defendants' motions to dismiss for several reasons. First, having asserted that the Defendants have engaged in fraud and employed contracts of adhesion, the Plaintiffs could seek a rescission of the contracts. *See, e.g.,* Amended Complaint, Prayer For Relief, subsection C. Second, there may be matters of dispute which are outside the scope of the contracts. Third, and most importantly, the Court will not attempt to adjudicate in a legal vacuum. Despite the conspicuous choice of law issue, the Plaintiffs and Defendants (with the exception of Defendant Foundation) have not apprised the Court of what they believe to be the appropriate choice of law rule and the appropriate forum law to be applied with respect to each individual Defendant.

## STATE PROMPT–PAY STATUTES

The Plaintiffs allege that Defendant Humana violated various state "prompt pay" statutes in a manner which entitles the Plaintiffs to relief. According to the Plaintiffs, "[a]pproximately 95% of Humana subscribers and the class members providing medical services to said subscribers are located in the 15 states referred in Paragraph—[sic], *supra.*" Amended Complaint, ¶ 310. The Plaintiffs aver that 13 of these states (Arkansas and Indiana are the exceptions) have "prompt pay" statutes requiring "Humana to pay claims for medical services rendered within a stated period of time," and that Humana systematically violated these statutes to the detriment of Plaintiffs. *Id.* at ¶¶ 310, 311. The Plaintiffs did not allege a cause of action against any Defendants other than Humana and maintain that this omission was unintentional.

Aetna's and Foundation's motions to dismiss the state law prompt pay statutory claims are granted to the benefit of all Defendants, including Humana. The Court will give the Plaintiffs leave to amend their complaint no later than March 26, 2001. Any re-pleading of these state prompt pay claims should identify which state statutes are being alleged and which Defendants are alleged to have violated which statute. Furthermore, the Plaintiffs must state how each Defendant violated

the statute (or refer to material from the Amended Complaint), prescribe which statutory section provides an explicit cause of action, and, if no such provision exists, acknowledge that the Plaintiffs are relying on an implied cause of action theory.

### FEDERAL PROMPT–PAY REQUIREMENTS

The Plaintiffs assert an implied claim for relief pursuant to the Omnibus Budget Reconciliation Act of 1986, § 9312(d), which they submit is "codified" at 42 CFR § 417.500(a)(6). Amended Complaint, ¶ 304. This provision states as follows: "(a) Basis for imposition of sanctions. [The Health Care Financing Administration] may impose the intermediate sanctions specified in paragraph (d) of this section, as an alternative to termination, if HCFA determines that an HMO or CMP does one or more of the following: .... (6) Fails to comply with the requirements of section 1876(g)(6)(A) of the Act relating to the prompt payment of claims." 42 CFR § 417.500(a)(6). Section 1876(g)(6)(A) was repealed following the promulgation of this regulation.

The Plaintiffs do not elaborate beyond citation to Section 417.500 and vague invocations of the federal Medicare program when discussing the source of their proposed implied right of action (nor do they comment on Section 1876(g)(6)(A)). The Plaintiffs cannot rest this purported right upon an administrative regulation alone, for "[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.'" *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213–14, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), quoting in part *Dixon v. United States,* 381 U.S. 68, 74, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965) and *Manhat-tan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936). *See also Stewart v. Bernstein,* 769 F.2d 1088, 1093 (5th Cir. 1985) ("[T]he federal regulations cannot themselves create a cause of action; this is a job for the legislature."); *Sandoval v. Hagan* (N.D.Ala.1998), 7 F.Supp.2d 1234, 1256 n. 20 ("[N]o implied private right of action can be found from regulations standing alone.").

Some Defendants suggest that the Plaintiffs might rely upon 42 U.S.C. § 1395mm(g)(6). *See NME Hosps., Inc. v. Bowen,* Civ. A. No. 87–1450 (D.D.C. May 29, 1987) (observing that 42 U.S.C. § 1395mm(g)(6) was enacted through Section 9312(d)(1) of the Omnibus Budget Reconciliation Act of 1986). Yet this statute does not establish general prohibitions, but rather it stipulates certain restrictions and requirements which all relevant contracts between HMOs and the government must contain. *See* 42 U.S.C. § 1395mm(g)(6)(A) ("A risk-sharing contract under this section shall require the eligible organization to provide prompt payment ... of claims submitted for services and supplies furnished to individuals pursuant to such contract, if the services are not furnished under a contract between the organization and the provider or supplier."). Another provision, 42 U.S.C. § 1395u, which offers Plaintiffs' buzzwords of "clean claims," "95 percent" and "30 calendar days," is similarly limited in scope. *See* 42 U.S.C. § 1395u(c)(2)(A) ("Each contract under this section which provides for the disbursement of funds ... shall provide that payment shall be issued, mailed, or otherwise transmitted with respect to not less than 95 percent of all claims submitted under this part ... which are clean claims, and ... for which payment is not made ... within the applicable number of calendar days after the date on which the claim is received.") *See also* 42 U.S.C. § 1395h(2)(A).

Moreover, the Plaintiffs' claim fails under the doctrine of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) and its progeny. The *sine qua non* of an implied right of action is that it must be shown that "Congress intended to create the private remedy sought by the Plaintiffs." *Suter v. Artist M.*, 503 U.S. 347, 363, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992); *Baggett v. First Nat'l Bank*, 117 F.3d 1342, 1345 (11th Cir.1997) ("In determining whether Congress intended to confer a private right of action, congressional intent is the dispositive inquiry."). The burden is on the proponent of the implied cause of action to demonstrate the existence of this congressional intent. *Suter*, 503 U.S. at 363, 112 S.Ct. 1360. Furthermore, there is a presumption against finding such a cause of action. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *West Allis Mem'l Hosp., Inc. v. Bowen*, 852 F.2d 251, 254 (7th Cir.1988).

The Plaintiffs do not identify any legislative history suggesting that Congress intended to create such a remedy. A natural reading of these statutes and regulations demonstrates that they are meant to assist the Secretary in administering and enforcing specific contracts rather than creating an implied right of action for those individuals aggrieved by late payments. The Plaintiffs do not clearly explain how they could fit into the statutory scheme nor do they submit a persuasive argument for permitting a private civil action under a statute which appears to leave enforcement to the discretion of the Secretary of Health and Human Services. *See generally* H.R.Rep. No. 727 at 443 (1986), U.S.Code Cong. & Admin.News 1986 at 3607; *Heckler v. Ringer*, 466 U.S. 602, 614–15, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (finding no federal-question jurisdiction under 28 U.S.C. § 1331 be-

cause 42 U.S.C. § 405(g) is the "sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act."). Therefore the Court dismisses the claim brought under the federal prompt-payment statutes and regulations.

*CONCLUSION*

For the reasons stated above, it is

ADJUDGED that Defendants' motions to dismiss are GRANTED in part and DENIED in part. The provider Plaintiffs may file an amended complaint consistent with this opinion no later than Monday, March 26, 2001. The Defendants shall have until April 30, 2001 to respond to the amended complaint.